STATE ex rel. WOGAN et al. v. CLEMENTS, Com'r of Conservation.

No. 17306.

Court of Appeal of Louisiana. Orleans.

Nov. 13, 1939.

Rehearing Denied Dec. 11, 1939.

Writ of Review Granted Feb. 12, 1940.

John D. Miller and Chas. Payne Fenner, Jr., both of New Orleans, for appellants.

A. P. Miceli, of New Orleans, and Geo. M. Wallace, of Baton Rouge, for appellee.

JANVIER, Judge.

Relators pray for the issuance of alternative writs of mandamus directed to the Commissioner of Conservation of the State of Louisiana and ordering him to permit them to examine the records and books of his said office, the Department of Conservation of the State of Louisiana. They aver that the right to make such examination is granted by the so-called "Public Records Act", No. 242 of 1912, as amended, and they allege that the said Commissioner has refused to permit them to have access to the said records and books. Relators allege themselves to be citizens of the State of Louisiana, duly registered and qualified voters in the Parish of Orleans, and that each of them has, within the twelve months preceding the initiation of this proceeding, paid taxes collected under the authority of the State of Louisiana.

Respondent, the Commissioner of Conservation, resists this demand, and, as justifying his refusal to permit the relators to have access to the said books and records, presents the following contentions:

First: That at the time at which the relators, or some of them, applied for permission to have access to the said books and records, such books and records were and at all times since have been under the exclusive custody and control of the Supervisor of Public Funds of the State of Louisiana, who was and is engaged in making an audit thereof, and that, therefore, neither the relators nor anyone else could be permitted to have access thereto since this would obstruct and impede the said Supervisor of Public Funds in the making of the said audit, in violation of section 9 of Act 109 of 1918, which, in part, imposed a penalty against anyone who "in any manner, shall obstruct or impede said Supervisor of Public Accounts in making the examination required by this Act".

Second: That the "Public Records Act", under which the privilege is sought and which, generally speaking, gives the public the right to examine the books and records of almost all of the various boards, bureaus and departments of the State, cannot apply in the present instance since that Act, in section 3, declares that:

"The provisions of this Act shall not apply to any records, writings, accounts, letters, letter books, photographs or copies or memoranda thereof in the custody or control of the Supervisor of Public Accounts unless otherwise provided by law, nor shall the provisions of this Act apply to any records, writings, accounts, letters, letter books, photographs or copies or memoranda thereof in the custody or control of the examiner of State Banks." As amended by Act No. 185 of 1916.

Third: That, since the said books and records were and are being audited by the Supervisor of Public Funds, they are under his custody and control and were not and are not under the custody and control of respondent, the Commissioner of Conservation, and, consequently, that he, the re-

spondent, could not and cannot grant access thereto since such access may be granted only by the Supervisor of Public Funds, and that, consequently, application should have been made not to respondent, but to the said Supervisor in accordance with the intent expressed in section 11 of the said "Public Records Act", which section reads as follows:

"If any public record applied for by a person authorized to exercise the privilege granted by this act shall not be in the custody or control of the person to whom the application is made, such person shall promptly so certify to the applicant in writing and shall in such certificate state in detail to the best of his knowledge and belief the reason for the absence of the record from his custody or control and its location and the manner and method in which and the exact time at which it was taken from his custody or control and shall include in such certificate ample and detailed answers to all inquiries of the applicant that there are pertinent to the facilitation of the exercise of the privilege granted by this act."

Fourth: That the relators, when they applied for permission to examine the said records and books, did not present evidence showing their qualifications; that is to say, did not produce to respondent evidence showing that they were either taxpayers or qualified electors.

There was judgment below rejecting the demand of relators. They have appealed.

We shall first consider the fourth contention touching upon the right of the relators to demand the privilege of examining the books and records in question.

The right to examine public records is granted by section 6 of the said statute (No. 242 of 1912) to "any elector of the State of Louisiana or any taxpayer who has paid any tax collected by or under the authority of the State of Louisiana within one year of the day in which said taxpayer shall apply to exercise the privilege granted by this act * * *". The record contains the following admission:

"It is admitted that each and all of the relators is an elector and tax payer of the State of Louisiana within the meaning of Act 242 of 1912 as amended, and were such on August 23, August 24, and August 28, 1939."

It is admitted, also, that when application to examine the records was made, which was on August 23 and August 24, 1939, no one of the applicants presented to respondent any evidence that he was a qualified elector or a taxpayer, but the record shows that at that time the said respondent did not question the qualifications of those who made the demand and based his refusal solely on the ground that the said books and records were being audited by the Supervisor of Public Funds. Since it is admitted that when the demands were made and when the suit was filed all of the relators were qualified and since it is admitted that the respondent did not, on either of those occasions, question the qualifications of the applicants, this contention cannot be urged now. Had respondent then demanded proof of their qualifications, the applicants, of course, would have found it incumbent upon them to produce this proof. But, since no such question was raised at that time, it cannot now be made the basis of a refusal of their demand if otherwise the record shows that they are entitled to this right.

We think that the three other contentions of respondent are so similar that they should best be considered together. Underlying all of them is this fundamental question: Is the Supervisor of Public Funds given exclusive right to and has he exercised the exclusive right to custody or control over the records, or is he given and has he exercised merely the much more limited and much less exclusive right of access for the purpose of making an audit of the books and records?

By section 3 of Act 109 of 1918, the Supervisor of Public Accounts is given authority "to examine and audit the books and accounts of all public boards and commissions, or any department of the State government", and, continuing, the same section provides that "* * * and to that end shall have access to all papers, books and documents in all offices which he may examine or audit under the provisions of this Act."

Section 1 of that statute, as amended by Act No. 32 of 1920, gives authority for the employment by the said Supervisor of Public Accounts of assistants and section 5 gives to such assistants "the same power and authority as is granted under this Act to the Supervisor of Public Accounts, except in the matter of administering oaths". By Act 69 of 1936, which, by approval by the people of the State on November 3, 1936, became section 26 of Article VI of

the Constitution, the office of "Supervisor of Public Accounts" was abolished and that entitled "Supervisor of Public Funds" was substituted, so that all laws which define the duties and powers of the Supervisor of Public Accounts now have application to the Supervisor of Public Funds.

Respondent concedes that the "Public Records Act" has, as its object, the protection of the rights of citizens and taxpayers to examine almost all public records and books, but maintains that, whenever any such records are under audit by the Supervisor of Public Funds and, to this end, are under the "custody or control" of that official, the right of examination is temporarily suspended, and this contention is said by counsel for respondent to be founded upon section 3 of the statute, which we have already quoted, and which excepts certain records which may be "in the custody or control of the Supervisor of Public Accounts". Respondent thus maintains that since, by section 3 of that Act, the Supervisor of Public Accounts (Funds) is given the right to audit the books and records and, to that end, is given the right of access to those records, all such records are within his custody or control and are temporarily withdrawn from public examination.

Counsel for relators, on the other hand, call attention to the difference between the right of access to. books and records for the purpose of making an examination and the right to custody or control, and they argue that there is no law which gives to the Supervisor of Public Funds any right greater than that of access to the records and books of any State department other than his own and they point to section 3 of Act 109 of 1918, which we have already quoted and which merely provides that the said Supervisor shall have access to all papers, books and documents in all offices which he may examine or audit.

Counsel for relators also contend that the provision in the Act of 1912, which exempts from the effect of the statute certain books, records, et cetera, "in the custody or control of the Supervisor", applies only to the records of the Supervisor's department and not to records of some other department which may be under audit by his department.

For convenience we·shall hereinafter refer to the Supervisor of Public Funds as the Supervisor, and to the respondent, the

Commissioner of Conservation, as the Commissioner.

If books and records which are being audited by the Supervisor are to be considered as under his supervision and control, then it is apparent that the right which relators seek must be denied them since, by express provision of the statute under which the right to make the inspection is sought, it has no application, and, on behalf of the Commissioner, it is argued that when, in the statute of 1912, the legislature exempted from the operation of the "Public Records Act" all books and records under the custody and control of the Supervisor, that exemption referred to and contemplated those records and books to which· later, by the Act of 1918, the Supervisor was given the right of access, since, according to counsel, the only right expressly given to the Supervisor by any statute is the right of access, and since, therefore, the exemption in the 1912 Act, which refers to records under his custody and control, would be meaningless because there is no statute—counsel for the Commissioner contend—which gives the right to such custody or control, unless it be the Act of 1918.

But we find ourselves unable to believe that the custody and control, which, under the earlier act, is necessary to the exemption, is merely the access which is granted by the later act. It is well recognized that there is a vast difference between the meaning of the words "to have access to" and the meaning of the term "custody or control".

In West's Louisiana Digest, Volume 16, ☞13, 14, verbum Records, there are two distinct references—one concerning the custody and control over records and the other concerning access to records. The same is true of Dart's "Louisiana Digest".

When the legislators, in 1918, gave to the Supervisor the right· of access to certain books and records, they were aware of the fact that the earlier statute of 1912 had exempted from its operation books and records, et cetera, in the "custody or control" of the Supervisor. The legislators were also aware of the recognized distinction between access to and custody or control of. If they had intended that all records under audit by the Supervisor should be under his custody and control, they would have so declared and no doubt would not have contented themselves with merely requiring that he be given access to such records.

And it is not quite correct to say that there is no explicit grant to the Supervisor of any right except that of access to records, and that, therefore, the exemption is meaningless unless the access granted by the one Act is to be construed here as custody and control within the contemplation of the other. The Act of 1918, which defines the duties and rights of the Supervisor, contains other provisions which clearly show that certain records, papers, et cetera, may actually come under his custody or control. A study of that Act will show that audits are provided for and that these are to be made at the office of the department which is being audited and that, in order that he and his assistants may make these audits, the Supervisor is granted access to the office and to the records. It will be noted, in addition to this right of access, the statute provides that, on certain occasions, the Supervisor may require that certain statements must be sent to him and that, when he so requires, "said statements shall be accompanied by vouchers and other papers necessary to prove the correctness of same". Section 4.

■ The said Act also, in section 9, provides for the imposition of a penalty upon anyone "who shall wilfully refuse or neglect to transmit to said Supervisor of Public Accounts such reports, statements of accounts or other documents upon request as provided by the terms of this Act". We have no doubt that, where such documents, reports, et cetera, are transmitted to the Supervisor, they are in the contemplation of the "Public Records Act", under his custody or control, until returned by him to the transmitting officer, and we have no doubt that, so long as they are in his custody or control, they are withdrawn from public inspection because of the exemption in the "Public Records Act". This is plainly a different situation from that which is presented where an audit is made in the office itself and where no records are taken by the Supervisor, who, for the purpose of making such audit, is merely given the right of access to the records. This is, we think, a possible meaning of the reference to records, et cetera, under the custody or control of the Supervisor.

It may also be that it was intended to exempt from the operation of the Public Records Act the books and records of the Supervisor himself, as is contended on behalf of relators. Counsel for the Commissioner argue that reference to records in the custody or control of the Supervisor involves not only the records of the Supervisor himself, but those records of other departments which his department may have under audit, and it is true that, when reference is made to records in the custody of one who audits records, the assumption is that the reference is to records other than his own. But when we notice that the statute, in other paragraphs, exempts from its operation records under the custody or control of other departments, we do not think that the assumption to which we have just referred is so easily adopted. Records under the custody or control of the governor, records under the custody or control of the sheriff, records under the custody or control of attorneys, might well mean the records of the particular office and not records of other offices turned over to the office in question. It therefore seems reasonably possible that the legislators, in the exemption pointed to here, may have contemplated merely the records of the Supervisor himself.

It may also be that when, in 1912, the legislators exempted from the operation of the "Public Records Act" books and records under the "custody or control" of the Supervisor, they had no particular records in mind, but intended that if, in the future, the Supervisor should be given the right to close any particular office and to take charge of the records of that office—as, in certain instances, the bank examiner may now do—in that situation the Supervisor should be given such custody or control as would prevent inspection by the public during that period of supervision or control.

■ And it may well be, as we have already suggested, that when, in 1918, the legislators gave to the Supervisor of Public Accounts (Funds) the right to make such audits, it recognized that in certain situations the Supervisor might have custody or control of records, and therefore intentionally refused to give him custody or control and merely gave him access to such records where a simple audit is being made. But, whether the Supervisor, when making an audit, is granted a right to the custody or control of the records which are being audited and to this end may temporarily suspend the operation of the "Public Records Act", it seems very apparent that, when he undertook to make

the audit in this instance, he assumed no such supervision or control.

■ In considering whether or not the Supervisor actually took custody or control of the records of the Commissioner, we bear in mind that there is always a presumption that a public officer has custody of the books and records of his office. "A public officer, by virtue of his office, is the legal custodian of all papers, books and records pertaining to his office". Corpus Juris, Volume 53, page 622, § 38, verbum "Records", citing United States v. Deneale, 25 Fed.Cas. p. 817, No. 14,946. This presumption may, of course, be overcome by proof to the contrary, and it is true that both the Commissioner and the Supervisor testified that the latter had had the custody and control of the books of the office of the former when the application for examination was made, and, in fact, had had that custody and control prior to the appointment of the Commissioner. But it is quite apparent that this was a mere legal conclusion, for, when they testified to the facts on which they based their statements, they showed, we think, that the actual custody and control had always remained in the Commissioner and that all the authority that the employees of the Supervisor had exercised was access to the books and records of the Commissioner.

The Commissioner testified that no books, records, or documents had been removed from his office and that they were all kept in their regular places and that all the regular employees of his department had continued to work on these records whenever they found it necessary to do so. In fact, he said that the employees of his department and the employees of the Supervisor worked in the office at the same time:

"When they are working on a book we need, we wait until they finish with it; if we are using a book, they wait on us."

The Supervisor stated:

" * * * We try not to interfere with the regular routine work of the Department that has to go on. Anything that we want to examine, unless there is some valid reason why we should not do so, we examine. It might be possible that we want some books that they are working on. We might wait a few minutes if they are in use."

It is true that he followed the above statement by saying that "we have complete custody and control of all records",

but, as we have already said, this was merely a legal conclusion on his part. He also said that at various times, many of the books of the Commissioner were not needed by his assistants or employees and that at all such times those books were in use by the employees of the Commissioner.

The evidence shows that the work of the Supervisor commenced at 8:30 in the morning and terminated at 4:00 o'clock and that the records of the Commissioner were always put away in the evening and taken out in the morning by an employee of the Commissioner.

From this evidence, then, we conclude that the truth is that the Supervisor at no time took over the custody or control of those books and records even if it be conceded that he and his assistants had the legal right to do so. It appears that the Supervisor exercised only the right of access to the records in question and that a similar right is given by the Public Records Act to the relators.

■ It must be conceded, of course, that where there is a right to examine public records, those members of the public who wish to make the examination must do so in such a way and at such a time as will interfere as little as possible with the work of the official whose records are being inspected and as little as possible with the work of any other public official who may have the right to also inspect or audit those records. But, on the other hand, it is the definite public policy of the State that any qualified person may make such an examination, and it necessarily follows that the public official must lend all possible reasonable cooperation to make the examination convenient. These principles were recognized in Marsh v. Sanders, 110 La. 726, 34 So. 752. In fact, it is provided in the Act itself, in section 10, that the inspection to which the public is entitled shall not disorder, hinder, or disarrange the work or function for which the said record is intended.

We have reached the conclusion that the books and records which the relators seek to examine are in the custody and control of the Commissioner and not in the custody and control of the Supervisor and that, therefore, because of the provisions of the pertinent statute, No. 242 of 1912, it is the clear ministerial duty of the Commissioner to permit relators to make the examination under the conditions set forth in the statute.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed, and it is now ordered, adjudged and decreed that peremptory writs of mandamus issue directed to Ernest S. Clements, Commissioner of Conservation of the State of Louisiana, directing and commanding that he grant to relators, or to any of them, subject to the provisions of Act 242 of 1912, the right of examining, copying, photographing and taking memoranda of any of the records or books of his office, as Commissioner of Conservation of the State of Louisiana in charge of the Department of Conservation. Respondent to pay all costs.

Reversed.